COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
|---|---|---|
| THE STATE OF TEXAS, |  | No. 08-10-00349-CR |
|  | § |  |
| Appellant, |  | Appeal from the |
|  | § |  |
| v. |  | 384th Judicial District Court |
|  | § |  |
| ARTURO JULIAN DURAN, |  | of El Paso County, Texas |
|  | § |  |
| Appellee. |  | (TC# 20100D02226) |
|  | § |  |
|  | § |  |

## O P I N I O N

While executing a search warrant for "A residence at 4737 Hercules, El Paso, Texas 79904," officers noticed a detached garage that had been converted into a separate living unit. Appellant Arturo Julian Duran, a seventeen-year-old freshman in high school, lived in the garage, and his father, Arturo Duran, lived in the house. After Appellant's father gave the agents permission to search the garage, they found child pornography on a computer there. Appellant was subsequently indicted for possession of child pornography. He filed a motion to suppress, arguing that the search warrant was limited to the house. The trial court granted the motion. On appeal, the State contends that the warrant authorized the search of the garage and, if it did not, Appellant's father had apparent authority to consent to the search of the garage. Agreeing with the State's second contention, we reverse the trial court's ruling and remand for trial.

### EVIDENCE FROM THE SUPPRESSION HEARING

Agents with Immigration and Customs Enforcement (ICE) determined that a computer

accessed child pornography using the internet at 4737 Hercules. The name associated with the internet protocol address for the computer was "Arturo Duran." Based on "computer checks," ICE agents determined that Appellant's father and Jose Duran were the only occupants of 4737 Hercules. The checks did not reveal that Appellant lived there. ICE agents conducted surveillance at the address on three occasions. Using a driver's license picture for comparison, the agents observed Appellant's father leaving the premises.

Agent Eileen Luera then submitted an application for a search warrant. The affidavit in support of the warrant sought to search "the entire premises located at 4737 Hercules." A federal magistrate judge granted the application. The style of the warrant is "In the Matter of the Search of A residence at 4737 Hercules, El Paso, Texas 79904." Attachment A described the property to be searched as:

> 4737 Hercules, El Paso, TX 79904. The property is further described as a single story residential building serviced in white stucco. The residence has a grey shingled pitched roof and bordered with brown flashing [sic]. There are two four pane windows situated on each side of the black in color security front door.

This description was accompanied by a photo of the premises. A garage is not visible in the photo. Attachment B authorized the search and seizure of "images of child pornography and files containing images of child pornography in any form wherever it may be stored or found . . . ."

At the suppression hearing, Appellant introduced photographs in which part of a structure that looks like a garage is visible to the right and partially behind the house. A typical garage door can be seen on the structure. Agent Luera testified that she did not realize that the garage was detached when she submitted the application for the search warrant.

Luera and several other agents executed the search warrant. Appellant's father answered

the door of the house and told the agents that Jose Duran, the other known occupant of the premises had recently moved out.

The agents apparently found no pornography in the house. Appellant's father explained how it was that the agents eventually searched the garage: "Well, the thing is that when . . . they sat me down in the dining room, and I had all the officers there . . . [t]hat's when one of the ICE agents turned around and looked through the window . . . and said, What is that?" He replied, "That's where my son lives." The agents asked him if they could search the garage, and he gave them permission to do so.[1]

Agent Luera indicated that the agents requested the father's consent because she did not believe that the search warrant authorized a search of the garage. When requesting consent, the agents did not ask about the circumstances under which Appellant lived in the garage. For example, they did not ask whether he paid rent. Explaining why they did not ask this question, one agent testified, "As far as I knew, he was a student."

The United States Attorney's Office had a policy of not prosecuting anyone under eighteen years' old. Therefore, once the agents discovered that the perpetrator was seventeen years' old, they contacted the El Paso Police Department to proceed with the investigation. After El Paso police detectives viewed the child pornography on the computer, Appellant personally typed a statement in the presence of one of the detectives. In the statement, Appellant said that

---

[1] Appellant's father signed a written consent form, which authorized "a complete search of all computer/electronic equipment located at 4737 Hercules detached garage." Although this form only authorized a search of computer and electronic equipment, neither side has suggested that this alters the analysis of the legal issues. *But see United States v. Andrus*, 483 F.3d 711, 717-21 (10th Cir. 2007)(applying a specialized analysis where the defendant's father consented to a search of the defendant's computer).

he lived at "4737 Hercules with [his] father." Specifically, he lived in a garage that was in the backyard and that was "converted to a studio." Appellant described himself as a freshman in high school. He admitted that he downloaded the child pornography and that he "viewed it more than several times." However, he claimed that he downloaded the material out of curiosity, and not for "sexual pleasure."

Appellant's father testified that he pays all the bills for the property, including the bill for the computer service. He had no access to the garage, and Appellant had the only key to its door. Appellant did not pay rent to live in the garage. But because he had "his privacy there," he was "asked to do chores, maintain his living area, clean," and do yard work. Appellant's father stated that the garage has its own bathroom and appliances, including a refrigerator, microwave, and television. Appellant had everything he needed to live there without having to go into the main house.

In its written findings of fact and conclusions of law, the trial court found that the "application for the search warrant did not include the detached garage[] located at the same address" and the search warrant "did not include the detached garage[] located at the same address." The court found the testimony of Appellant's father to be credible and specifically noted the following testimony: the garage had been converted into an apartment, Appellant had the only key to the garage and exclusive authority over the garage, and Appellant's father did not have access to the garage and had not gone into it after Appellant moved there. The court concluded that the search warrant did not authorize the search and seizure of any property from the garage, Appellant's father did not have "any authority" to consent to search the garage, the search of the garage was illegal because it was conducted without a valid warrant or valid

consent, and any statements made by Appellant after the search are inadmissible as fruits of the poisonous tree.

## THE SEARCH WARRANT

In its first issue, the State asserts that the search warrant authorized the search of the garage. We review this issue *de novo* to the extent that it turns solely on the language of the warrant. *See Peralta v. State*, 338 S.W.3d 598, 607 (Tex.App.--El Paso 2010, no pet.).

The State argues that the warrant incorporates the affidavit that was attached to the application for the warrant. The affidavit sought to search "the entire premises located at 4737 Hercules." The State construes "entire premises" to encompass the detached garage.

When an affidavit is attached to the warrant or incorporated by reference into the warrant, the two documents should be considered together as defining the place to be searched. *Long v. State*, 132 S.W.3d 443, 446 n.11 (Tex.Crim.App. 2004); *Affatato v. State*, 169 S.W.3d 313, 316-17 (Tex.App.--Austin 2005, no pet.). In this case, however, the affidavit was not attached to the warrant. Nor can we agree with the State that the warrant incorporated the affidavit by reference. There is only one mention of the affidavit in the warrant. It states: "I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property." Nothing in this statement incorporates the affidavit into the warrant.

The State also argues that even if the warrant does not incorporate the affidavit, the warrant still authorized the search of the garage. In examining a warrant's description of the place to be searched, we must follow a commonsensical and practical approach, rather than an overly technical one. *See Long*, 132 S.W.3d at 448. Here, the warrant defined the place to be searched as "4737 Hercules, El Paso, TX 79904," and authorized the agents to search for images

of child pornography "wherever it [sic] may be . . . found" on that property. Although the house was the only structure specifically identified on the property, the agents were authorized to search other structures within the curtilage of the house. It is well settled that a warrant that authorizes the search of a residence ordinarily authorizes the search of structures within the curtilage of the residence, such as a detached garage. *See id*. at 448-49 & n.23; *see also Hughes v. State*, 843 S.W.2d 591, 595 n.5 (Tex.Crim.App. 1992)("[A] warrant authorizing the search of a house also permits the search of other structures or areas inside the 'curtilage' or area immediately surrounding the dwelling place."); *Affatato*, 169 S.W.3d at 315 ("Detached garages are generally within the curtilage of a residence.").

In this case, however, the detached garage had been converted into a separate living unit. To search two separate living units, officers must obtain a warrant for each one. *See United States v. Perez*, 484 F.3d 735, 739-41 (5th Cir. 2007); *United States v. Cannon*, 264 F.3d 875, 879 (9th Cir. 2001). When, as in this case, officers were unaware of the separate living units, *Maryland v. Garrison* guides the analysis.

In *Garrison*, an officer obtained a warrant to search "2036 Park Avenue third floor apartment." 480 U.S. 79, 80, 107 S.Ct. 1013, 1014, 94 L.Ed.2d 72 (1987). "[A]fter making a reasonable investigation, including a verification of information obtained from a reliable informant, an exterior examination of the three-story building at 2036 Park Avenue, and an inquiry of the utility company, the officer who obtained the warrant reasonably concluded that there was only one apartment on the third floor and that it was occupied by [the suspect]." *Garrison*, 480 U.S. at 81, 107 S.Ct. at 1015. As it turned out, the third floor was divided into two apartments--one occupied by the suspect, and one occupied by the defendant. *Id*. at 80, 107

S.Ct. at 1014. On these facts, the Supreme Court held that the warrant was valid when issued, but the Court indicated that the warrant would not have been valid if the officer should have known that the third floor had two separate living units. *Id*. at 85-6, 107 S.Ct. at 1017; *see also Perez*, 484 S.W.3d at 741 (citing *Garrison* for the proposition that one warrant for a multi-unit structure is valid if "the officers reasonably believed that the premises had only a single unit"). Similarly, if the officers who executed the warrant knew or should have known about the error in the warrant before they entered the premises, they would have been obligated to limit their search to the suspect's apartment. *Garrison*, 480 U.S. at 86, 107 S.Ct. at 1017-18. And as soon as they discovered that there were two apartments, they were required to stop searching the other apartment. *Id*. at 87, 107 S.Ct. at 1018.

Thus, under *Garrison*, the relevant questions are whether Agent Luera should have known that there were two separate living units when she obtained the warrant and whether the agents should have realized the error in the warrant when they arrived at the scene. Although the parties presented evidence relevant to these issues at the suppression hearing, the trial court made no findings on the issues. In a recent decision, the Court of Criminal Appeals held that when a trial court enters findings of fact, but fails to make an explicit finding on a dispositive issue, we should not assume that the court made an implicit finding on the issue to support its ruling. Instead, we should remand for the trial court to make an explicit finding on the issue. *See State v. Elias*, 339 S.W.3d 667, 676 (Tex.Crim.App. 2011). *But see State v. Weaver*, No. PD-1635-10, 2011 WL 4715178, at *5 (Tex.Crim.App. Sept. 28, 2011)(upholding a suppression ruling, post-*Elias*, on the basis of an implicit factual finding). As explained below, however, we agree with the State's argument that Appellant's father had apparent authority to consent to the search of the

garage. We therefore find it unnecessary to remand for additional fact-finding. *See Elias*, 339 S.W.3d at 679.

In its second issue, the State asserts that Appellant's father had apparent authority to consent to a search of the garage. A person may validly consent to a search if the person has common access to, and control over, the property. *Limon v. State*, 340 S.W.3d 753, 756 (Tex.Crim.App. 2011). Here, the trial court accepted the father's testimony that Appellant had exclusive control over the garage. The State concedes that based on the father's testimony, there is sufficient evidence to support a conclusion that he did not have actual authority to consent.

Even if actual authority does not exist, consent may be validly obtained from a person who had apparent authority over the property. *See Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *Limon*, 340 S.W.3d at 756. To determine whether a person had apparent authority, we must ask: "would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Limon*, 340 S.W.3d at 756, *quoting Rodriguez*, 497 U.S. at 188, 110 S.Ct. at 2801. This is an objective standard. *Id*. "[R]easonableness hinges on widely shared social expectations and commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interest." *Id*. at 756-57 [Internal quotation marks and footnote omitted].

The Supreme Court has stated that apparent authority will not validate a search if the surrounding circumstances were such that a reasonable person would doubt whether the person had authority to consent. *Rodriguez*, 497 U.S. at 188, 110 S.Ct. at 2801. In those circumstances, officers have an obligation to inquire further before searching. *See id*., 110 S.Ct. at 2801. Texas

appellate courts, including this one, have construed these admonitions to mean that officers cannot "rely upon consent given in ambiguous circumstances." *See, e.g., Valdez v. State*, 336 S.W.3d 330, 335 (Tex.App.--San Antonio 2010, no pet.); *Giles v. State*, No. 08–01–00080–CR, 2003 WL 68178, at *4 (Tex.App.--El Paso Jan. 9, 2003, no pet.)(not designated for publication). *But see Limon*, 340 S.W.3d at 758 (declining to determine whether a court was correct in stating that "an officer may not proceed in an ambiguous situation without first verifying that the person purporting to consent to the entry has authority to do so").

The State has the burden of proving apparent authority by a preponderance of the evidence. *Limon*, 340 S.W.3d at 757. A trial court's determination regarding apparent authority is reviewed *de novo* as a mixed question of law and fact. *Id*.

The State relies on *Hubert v. State*, 312 S.W.3d 554 (Tex.Crim.App. 2010). Although *Hubert* is an actual authority case, rather than an apparent authority case, we agree that it is relevant to the analysis. In *Hubert*, officers searched an adult defendant's bedroom in a house that he shared with his grandfather. *Id*. at 556. The grandfather opened the door to the defendant's bedroom for the officers to search it. *Id*. at 562. At the time of the search, the officers knew that the grandfather owned the house and that the grandfather "did not 'live' or sleep in the room that the [defendant] inhabited." *Id*. The Court of Criminal Appeals held that the fact that the grandfather did not sleep in the bedroom was insufficient, standing alone, to negate his authority to consent to a search of the bedroom. *Hubert*, 312 S.W.3d at 562-63. The court then noted that although a determination of joint access is always a fact-specific inquiry, "where the defendant lives with a parent or other close relative, and the relative consents to a search of defendant's bedroom, most courts presume that the relative has sufficient common

authority over the bedroom to authorize the consent to search." *Id*. at 563 [Internal quotation marks omitted]. The defendant may overcome this presumption by presenting evidence that he had exclusive possession of the searched premises. *Id*. While recognizing that some courts have refused to apply this presumption, the Court of Criminal Appeals refused to follow the reasoning of those courts on the facts before it. *Id*. at 563-64.

The State asserts that if courts may presume that a parent has authority to consent to a search of an adult child's bedroom, law enforcement officers could reasonably apply the same presumption. We are not convinced that it would always be reasonable for officers to apply this presumption. But we do believe that it was reasonable for the agents to believe that Appellant's father had authority on the facts presented here.

As in *Hubert*, Appellant and his father lived at the same address, and Appellant had separate living quarters at that address. Appellant's separate living quarters were in a detached garage, rather than a bedroom within the house. This suggests a weaker argument for authority than in *Hubert*. But given the fact that Appellant was only seventeen years' old, the fact that he lived in the detached garage does not negate a reasonable belief that Appellant's father could validly consent to a search of the garage. As one court has noted, "the parents of a minor child are in a considerably different position from the parents of an adult child." *In re D.C.*, 115 Cal.Rptr.3d 837, 844 (Cal.Ct.App. 2010). In particular, "a father has the responsibility and authority for the discipline, training and control of his children. In the exercise of his parental authority a father has full access to the room set aside for his son for purposes of fulfilling his right and duty to control his son's social behavior and to obtain obedience." *In re D.C.*, 115 Cal.Rptr.3d at 843. In Texas, a person under the age of eighteen is considered to be a minor. *See*

TEX.FAM.CODE ANN. § 101.003(a)(West 2008). A parent has the duty to care for, control, protect, and discipline a minor child. *Id*. at § 151.001(a)(2). Permitting the agents to search his son's living quarters to determine if his son was accessing child pornography was "a reasonable and necessary extension of [Appellant's] father's authority and control over his . . . moral training [and] health." *In re D.C.*, 115 Cal.Rptr.3d at 843; *see also Limon*, 340 S.W.3d at 756-57 (noting that reasonableness hinges on widely shared social expectations and commonly held understandings). A parent also has a specific duty to provide shelter for a minor child. TEX.FAM.CODE ANN. § 151.001(a)(3). Considering this duty, it was reasonable for the agents to conclude that Appellant's father had the authority to consent to a search of his son's living quarters.

Moreover, comparing the facts here to those in *Limon*, we conclude that the situation was not so ambiguous as to require further inquiry by the agents. In *Limon*, an officer learned that "the Limon kids" may have been involved in a shooting. 340 S.W.3d at 755. Knowing of only one Limon family in town, the officer went to that residence and knocked on the door at approximately 2 a.m. *Id*. at 755-56. The door was opened by a boy whom the officer did not know. *Id*. at 756. He learned later that the boy was only thirteen- or fourteen-years' old. The officer did not ask the boy if he owned or possessed the residence, but assumed that he resided there because he opened the door. *Id*. The officer told the boy that he was investigating a shooting and asked for permission to enter. The boy let him in the house. *Limon*, 340 S.W.3d at 756. The Court of Criminal Appeals held that there was "no ambiguity with respect to [the boy's] apparent authority." *Id*. at 758. Based on the facts available to the officer at the time, "a mature teenager, possibly an adult, opened the front door to him at 2:00 a.m. and, after hearing

-11-

that he was investigating a shooting, gave him consent to enter through the front door. We find that a person of reasonable caution could reasonably believe that [the boy] had the authority to consent to mere entry under those circumstances." *Id*. at 758-59.

Based on the facts available to these agents at the time, Appellant's father opened the door to the main house at 6 a.m. and, knowing that the agents were searching for child pornography, told them that they could search the area where his son lived, in a detached garage. There is no indication that he hesitated in giving consent, and Appellant's father testified that he did not tell the agents that they needed his son's consent to search the garage. There is nothing to indicate that the agents should have been aware, before they entered the garage, that it was a complete and separate living unit. The photographs that were admitted into evidence show what looks like a functioning garage with a door for vehicles to enter. Under these circumstances, Appellant's father had apparent authority to consent to the search of the garage. *See United States v. Bowden*, 380 F.3d 266, 269-71 (6th Cir. 2004)(holding that elderly father had apparent authority to consent to search of son's garage and officers had no duty to determine the father's "nexus to each individualized segment of the property prior to searching"), *rev'd on other grounds*, 544 U.S. 902, 125 S.Ct. 1615, 161 L.Ed.2d 274 (2005).

### CONCLUSION

The State's second issue is sustained. The suppression order is reversed, and the cause is remanded to the trial court for further proceedings.


November 16, 2011

CHRISTOPHER ANTCLIFF, Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.

(Do Not Publish)